**In the Interest of R.S., A Minor, Appellant**

Superior Court of Pennsylvania.

Submitted Jan. 29, 2004.
Filed April 6, 2004.

Erin M. Busch, Public Defender, Pittsburgh, for appellant.

Michael W. Steily, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before: FORD ELLIOTT, JOYCE and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 R.S.[1] appeals from the March 17, 2003 Order of Disposition imposing probation and ordering restitution of $100 to the Allegheny County Police Department, and costs of $112.50 to the Allegheny County Crime Lab. The Order was entered after appellant was adjudicated delinquent, having committed the crimes of possession[2] and possession with the intent to deliver[3] cocaine. Appellant argues counsel was ineffective for failing to move for the discovery of the identity of the confidential informant (CI), and that government agencies are statutorily excluded from receiving restitution. The facts as set forth in the trial court Opinion follow.

On April 29, 2002, two detectives, one working for the Allegheny County Police as an undercover officer, the other for the City of Duquesne Police as a support officer, were conducting a narcotics investigation in the Duquesne area. This investigation had been ongoing for some time and was aimed at eliminating or reducing drug trafficking in the area by identifying and arresting numerous suspected drug dealers. On the day in question, the undercover officer and his partner proceeded to Duquesne with the purpose of conducting undercover drug buys. Upon arriving, the undercover officer met with a confidential informant who had arranged a drug purchase from [appellant]. At approximately 1:45 in

---

1. While the trial judge has correctly identified the appellant as R.S. in her Opinion, the parties' briefs both incorrectly use S.R. as appellant's initials.

2. 35 Pa.C.S.A. § 780–113(a)(16).

3. *Id.,* § 780–113(a)(30).

the afternoon, the undercover officer spotted [appellant] standing with his confidential informant on Fifth Street. The informant got into the undercover officer's car and they pulled into an alley. [Appellant] then came up to the driver's side window and engaged the undercover officer in conversation. In the course of this conversation, the undercover officer purchased two baggies of cocaine hydrochloride.

Immediately after this transaction occurred, the undercover officer contacted his support officer and recorded notes on paper and in his cell phone. These notes contained the time of the transaction and the appearance and attire of [appellant]. After relaying this information to the support officer, the support officer identified [appellant] to the undercover officer since he had previously arrested [appellant] for robbery. Later, the two detectives returned to the station house and the undercover officer correctly identified [appellant's] photograph.

[Appellant] was not arrested until February, 2003, a delay of approximately ten months. The police stated the reason for this delay was the ongoing, large scale investigation aimed at making many arrests of many drug dealers. If [appellant] had been arrested earlier, according to police, the undercover officer and the confidential informant would have become exposed and therefore useless in further investigations. The police waited until their entire investigation was complete before arresting [appellant]. At [appellant's] hearing on March 17, 2003, I found this was a reasonable delay of the arrest and that the testimony of the officers was credible despite testimony from [appellant] and his mother that he was at home at the time of the drug sale. I found that [appellant] has committed the acts of possession with intent to distribute cocaine and possession of cocaine. [Appellant] had successfully completed the Allegheny Academy intensive supervision program as a result of a prior adjudication. Testimony was also presented that he was performing well in school and holding a job, allowing him to make good progress towards repayment of previous restitution. Therefore, I placed him on probation and ordered him to pay restitution to Allegheny County for $100 used to purchase the drugs by the undercover officer and $112.50 in lab fees used for analyzing the contents of the baggies.

Trial Court Opinion, Mulligan, J., 7/10/03 at 1–2.

■ ¶ 2 Appellant first argues trial counsel was ineffective, "for failure to move to discover the identity of the confidential informant who was the only non-police witness to the drug transaction for which [he] was arrested." Appellant's brief at 6. While in his statement of matters complained of on appeal appellant failed to provide the court with a reason why the CI's identity was of importance to his appeal, in his brief he argues, "there was a reasonable probability that the informant could have given evidence that would have exonerated [him]." Appellant's brief at 6. "The information was material to [appellant's] defense of mistaken identity" (appellant's mother testified he was home with her at the time of the sale), and "the request was reasonable because there was little chance that disclosure of the informant's identity could have jeopardized the safety of an informant [.]" *Id.*

■ ¶ 3 The Superior Court will not disturb the juvenile court's disposition absent a manifest abuse of discretion. *In re J.D.,* 798 A.2d 210 (Pa.Super.2002). Counsel is presumed effective and the burden of

proving otherwise lies with the appellant. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326 (1999). In order to successfully demonstrate ineffective assistance of counsel, the petitioner must establish: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability the outcome of the proceedings would have been different. *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592 (2000). Once it is determined counsel's choice of tactic had some reasonable basis designed to effectuate his client's interests, the court's inquiry into ineffectiveness ends. *Commonwealth v. Abdul–Salaam*, 570 Pa. 79, 808 A.2d 558 (2001). Moreover, if the petitioner has not met the prejudice prong of the three-part test, we need not consider whether the first two prongs have been met. *Commonwealth v. Neal*, 713 A.2d 657 (Pa.Super.1998).

¶ 4 The Pennsylvania Supreme Court has adopted the following guidelines with regard to the disclosure of a CI's identity.

We believe that no fixed rule with respect to disclosure of the confidential informant's identity is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Commonwealth v. Belenky*, 777 A.2d 483, 488 (Pa.Super.2001), (*quoting Commonwealth v. Carter*, 427 Pa. 53, 59, 233 A.2d 284, 287 (1967)).

This balance is initially weighted toward the Commonwealth, which holds a qualified privilege to maintain an informant's confidentiality to preserve the public's interest in effective law enforcement. However, the balance tips in favor of disclosure where guilt is found solely on police testimony from a single observation and testimony from a disinterested source, such as the informant, is available.

Before the informant's identity may be revealed, however, the accused must show the information is material to the defense and the request is reasonable. The defendant need not predict exactly what the informant will say, but he must exonerate him. More than a mere assertion that disclosure of the informant's identity might be helpful is necessary. Only after this threshold showing that the information is material and the request is reasonable is the trial court called upon to determine whether the information is to be revealed.

*Belenky, supra,* at 488.

¶ 5 The undercover officer who purchased the drugs from the appellant, Detective John Love of the Allegheny County Police, testified on behalf of the Commonwealth. On the day in question, according to Detective Love, he went to the city of Duquesne in an ongoing effort to purchase drugs from identified dealers and help reduce drug trafficking in the area. Detective Love observed his CI standing on a street corner chatting with appellant, and pulled into a nearby alley. The CI got in the officer's car, and momentarily, appellant approached the driver's side window and spoke with the detective. Detective Love told appellant he wished to purchase crack cocaine, to which appellant replied he only had cocaine hydrochloride. The officer told appellant he wanted to purchase $100 worth, and the exchange oc-

curred. The detective then immediately left the area and contacted the Duquesne City support officer, Lieutenant Scott Adams. During this mid-afternoon encounter, Detective Love was able to identify appellant that day as wearing nothing on his head to obscure his face, a gray-colored sweatshirt and shiny jeans, and red tennis shoes.

¶ 6 The detective explained to the court his system for recording information immediately following controlled buys;

> Immediately after undercover buys, I have a pen and piece of paper in my car and also have a memo on my [cell] phone and immediately afterwards I'll call Lieutenant Adams and jot notes down, notes such as what he's wearing and any set of circumstances that might have been unique and the approximate time it occurred.

N.T., 3/17/03 at 13. "With my cell phone, I have a memo that works very nicely. I can press it and actually record as someone is walking away, I can say red tennis shoes or charcoal sweater or anything else that may be unique to the situation." *Id.* at 18. The detective continued, explaining how in this particular situation the appellant was identified. As soon as the buy occurred, the detective notified his support officer, Lieutenant Adams, a native of the city of Duquesne who has worked as an officer there for 15 years, and provided a description, including physical features and clothing. Within seconds, the lieutenant saw appellant on the street and immediately recognized him as the appellant, a youth whom he had arrested on a prior occasion. *Id.* at 22–23. The detective later selected appellant's picture from a photo array. The officers chose not to arrest appellant at that time because to do so would have jeopardized a larger, on-going effort to reduce drug-trafficking in Duquesne.

¶ 7 The court heard this testimony, as well as that of the appellant and his mother, who both swore he was home at the time of the drug transaction, and found the Commonwealth witnesses credible. We will not disturb that finding. *See Commonwealth v. Causey,* 833 A.2d 165 (Pa.Super.2003) (stating, *inter alia,* that the trier of fact, in passing upon the credibility of witnesses, is free to believe all, some or none of the evidence presented).

¶ 8 While case law indicates that the identity of a CI, under most circumstances, must be revealed if a defendant is found guilty based solely on the uncorroborated testimony of a single officer, *see Belenky, supra,* here we have the simultaneous, detailed description of the actor, immediately corroborated by a second individual familiar with the suspect, and a photo identification by the undercover officer within hours of the transaction.

¶ 9 The matter before us is similar to that before the Supreme Court in *Commonwealth v. Bing,* 551 Pa. 659, 713 A.2d 56 (1998), wherein the appellant, convicted of drug trafficking, wanted the CI's identity revealed because he alleged he was misidentified by an undercover police officer. The *Bing* Court concluded that disclosure of the CI's identity was not required where, as here, there was corroborating evidence identifying the actor. In the matter before us, in addition to observing appellant at close range, Detective Love immediately memorialized their encounter in writing and on his cell phone. He then alerted his support officer, Lieutenant Adams, who within 60 seconds, observed appellant, dressed as described, walking up the street. Lieutenant Adams immediately recognized appellant as an individual he had previously arrested in the city of Duquesne, and identified him to Detective Love. A short time later, Detective Love identified ap-

pellant, from a police file picture, as the man who had sold him drugs. Based on this corroborating evidence, we agree it was not necessary to disclose the identity of the CI, and trial counsel was not ineffective for failing to move for such disclosure.

¶ 10 Appellant also argues the order of restitution is illegal because (1) it was directed to be made to government agencies, and government agencies are not "victims" of crime, as contemplated by statute; and (2) the court did not determine appellant's ability to pay.[4] Appellant argues that while there is no definition of victim in the Juvenile Act, it is defined in the Crimes Code, and that because the same provision of the Judicial Code governs restitution under both the Juvenile Act and Crimes Code, the Crimes Code definition of victim, which necessarily precludes governmental agencies, should control.

¶ 11 The Juvenile Act, one of the purposes of which is to hold children accountable for their behavior, authorizes the court to "order[] payment by the child of reasonable amounts of money as fines, costs or restitution as deemed appropriate as part of the plan of rehabilitation concerning the nature of the acts committed and the earning capacity of the child." 42 Pa.C.S.A. § 6352, Disposition of delinquent child, (a) General rule.(5). Contrary to appellant's argument, the court is not bound by the Crimes Code, but enjoys discretion when deciding whether to impose restitution as part of the overall goal of apportioning responsibility and accountability, subject to the child's ability to pay. Our Supreme Court has explained the distinction be-

tween the imposition of restitution under the Crimes Code versus the Juvenile Act.

As is apparent from the face of Section 6352, the rehabilitative policy of the Juvenile Acts' restitution provision corresponds to that which supports the imposition as a condition of probation in a criminal case. Section 6352, unlike the provision of the Crimes Code providing for restitution as a condition of sentence, does not contain language specifically requiring that the loss or injury be a direct result of the juvenile's wrongful conduct. Consistent with the protection of the public interest and the community, the rehabilitative purpose of the Juvenile Act is attained through accountability and the development of personal qualities that will enable the juvenile offender to become a responsible and productive member of the community. Thus, the policies underlying the Juvenile Act and its restitution provision, as well as the plain language of Section 6352, serve to invest the juvenile court with a broad measure of discretion to apportion responsibility for damages based upon the nature of the delinquent act and the earning capacity of the juvenile.

*In re M.W.*, 555 Pa. 505, 512–513, 725 A.2d 729, 732–733 (1999).

¶ 12 We agree that the order of restitution, to repay the county for costs incurred as a consequence of appellant's criminal behavior, sends to the juvenile the exact message desired; that he will be held accountable for his unlawful behavior. Because he was already under the court's supervision, and successfully had satisfied the greater amount of restitution owed as

4. While ordinarily this issue would be waived for failure to include it in appellant's 1925 Statement, appellate counsel concedes this oversight, admitting her ineffectiveness. Appellant's brief at 21. That being said, because

this is a juvenile case, and relief pursuant to the Post Conviction Relief Act is not available, this issue may now be addressed. *See In re B.S.*, 831 A.2d 151, 154 n. 1 (Pa.Super.2003).

a result of prior delinquent behavior, the court was aware of appellant's financial ability to pay the restitution ordered. The appellant and his probation officer informed the court that as of the March 17, 2003 hearing, appellant was working 16 to 20 hours per week at a dry cleaners, and had paid $208.75 of $355.75 restitution owed as a result of previously having been adjudicated delinquent for committing the crime of robbery. N.T., at 37, 44–45. The fact the court may have been unaware of appellant's hourly wage is not critical, as the court did know he had the ability to pay the amount assessed. We find appellant's arguments relative to restitution to be devoid of merit.

¶ 13 On these bases, we conclude there is no merit to the issues raised, and we therefore affirm the Order of Disposition.

¶ 14 Order affirmed.